**STERLING ENERGY, LTD., d/b/a Senco, a Texas Corporation, Plaintiff-Appellant,**

v.

**FRIENDLY NATIONAL BANK, an Oklahoma banking corporation; and George W. Higgins, Jr., Defendants-Appellees.**

**No. 83–1424.**

United States Court of Appeals, Tenth Circuit.

Oct. 3, 1984.

John H. Scaggs, Walters, Okl., for plaintiff-appellant.

Edward B. Carrier, Jr., Oklahoma City, Okl., for defendants-appellees.

Before SETH, BREITENSTEIN and SEYMOUR, Circuit Judges

SEYMOUR, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); Tenth Cir.R. 10(e). The cause is therefore ordered submitted without oral argument.

Sterling Energy appeals from the district court's order awarding attorneys fees to Friendly National Bank. Sterling claims the trial court erred in finding that Sterling prosecuted its case against the bank in bad faith. We have concluded that the district court's order below reveals an insufficient basis for finding bad faith, and accordingly we remand for more specific findings.

I.

Sterling Energy is a petroleum products marketing company based in Irving, Texas. Its president, Sterling Russell, has been in the business since 1958, buying and selling petroleum and its various by-products. In 1979, Lee Sullivan, a petroleum broker with whom Russell had done business since the early 1970's, contacted Russell about some diesel fuel available in Oklahoma from George Higgins. Although Russell did not know Higgins, he agreed to buy 760,000 gallons of the fuel. He wired a prepayment of $102,700 to Higgins' account at the Friendly National Bank in Oklahoma City, Oklahoma on November 6, 1979, anticipating delivery by Higgins on November 15. Higgins never delivered the fuel, and to

date has returned only $23,700 of the original $102,700 prepayment.

Russell brought a diversity action against Higgins and Friendly National Bank to recover the $79,000 of unreturned prepayment and other damages. He alleged a breach of contract claim against Higgins. He also alleged that Higgins and the bank, acting in concert, maliciously and fraudulently induced Russell to enter into a contract with Higgins for the purchase of diesel by falsely representing that Higgins had a contract to purchase the diesel from a third party, and that Higgins was financially sound and able to deliver the diesel to Russell. Russell alleged further that he relied on the misrepresentations and transferred $102,700 through the bank to Higgins, and that Higgins failed to deliver the diesel and misappropriated the money. Russell sought punitive as well as compensatory damages against both parties.

Higgins confessed judgment on the breach of contract claim prior to trial. Thereafter his attorney was granted leave to withdraw because Higgins disappeared and his attorney was unable to contact him. Higgins did not appear at trial to contest the fraud claims.

After a jury trial, the judge directed a verdict against Higgins for the full amount of Russell's claim, and dismissed Russell's fraud claim against the bank. Upon subsequent motion, the judge awarded the bank $17,500 in attorneys fees on the ground that Russell had prosecuted the fraud claim against the bank in bad faith. The sole issue on appeal is whether the judge properly awarded attorneys fees to Friendly National.[1]

## II.

■ Under the traditional American rule, the prevailing party ordinarily cannot obtain attorneys fees from a losing party. *See Hall v. Cole,* 412 U.S. 1, 4–5, 93 S.Ct. 1943, 1945–1946, 36 L.Ed.2d 702 (1973). An exception exists which allows an award of attorneys fees when a party's opponent acts " 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Id.* at 5, 93 S.Ct. at 1946 (*quoting* 6 J. Moore, Federal Practice ¶ 54.77[2] at 1709 (2d ed. 1972)). *See also Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *accord, United States v. 2,116 Boxes of Boned Beef,* 726 F.2d 1481, 1488 (10th Cir. 1984); *Rutledge v. Sunderland,* 671 F.2d 377, 382 (10th Cir.1982); *Cornwall v. Robinson,* 654 F.2d 685, 686–87 (10th Cir. 1981).[2]

■ A party acts in bad faith only when the claim brought "is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1088 (2d Cir.1977). The standard for bad faith awards is stringent, for "[o]therwise those with colorable, albeit novel, legal claims would be deterred from testing those claims in a federal court." *Id.* Thus, courts generally require a finding by the trial judge of subjective bad faith. *See, e.g., Badillo v. Central Steel & Wire Co.,* 717 F.2d 1160, 1165 (7th Cir.1983) (citing cases); *Cornwall,* 654 F.2d at 687. Awarding attorneys fees under the bad faith exception is within the discretion of the trial judge, and an appellate court will reverse only when it finds the lower

---

1. Sterling Energy also contends that the amount awarded as attorneys fees is excessive. Given our disposition of this case, we do not reach this issue.

2. As this case arises in a diversity setting, we briefly note and dispose of the potential issue under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). No *Erie* problem arises here because no substantial difference exists between federal and Oklahoma law regarding the bad faith exception. *See, e.g.,*

*City National Bank & Trust Co. v. Owens,* 565 P.2d 4, 7–8 (Okla.1977). Moreover, even when a federal court sits in a diversity case, it can exercise its inherent power to sanction those who abuse its process. *See Montgomery Ward & Co. v. Pacific Indemnity Co.,* 557 F.2d 51, 61 (3d Cir.1977) (Gibbons, J., concurring). For a more complete discussion of this issue, see generally *Republic of Cape Verde v. A & A Partners,* 89 F.R.D. 14, 20 n. 12 (S.D.N.Y.1980).

court has abused its discretion. *See Ryan v. Hatfield*, 578 F.2d 275, 277 (10th Cir. 1978); *accord, Cornwall*, 654 F.2d at 687.

In the present case, the trial court made a finding of bad faith as follows:

"The evidence produced at trial clearly revealed that the Bank had no business relationship with the plaintiff and had merely rendered an opinion, at the plaintiff's insistence, concerning the existence of a contract. After all the evidence was heard, the Court determined that no basis for a fraud claim existed. However, for the Court to reach this determination, the Bank was required to defend its reputation, integrity and honesty .... A party has an affirmative duty to evaluate its claim in light of all facts known to it. In this case, the facts known to plaintiff did not justify the allegations of fraud directed at the defendant bank. Thus, for the plaintiff to have prosecuted this action against the defendant Bank constituted bad faith."

Rec., vol. I, at 235.

We agree that the facts in this case do not justify the allegations of fraud against Friendly National. The sole basis for the fraud allegations against the bank arose out of a telephone conversation on November 5, 1979 between Russell and Nona Parrott, an assistant cashier at Friendly National. Due to the large amount of the prepayment and because he did not know Higgins, Russell decided to check on Higgins' background before sending him the money. He first inquired of his long time business acquaintance Sullivan, who assured him that "everything was all right with Mr. Higgins."[3] Rec., vol. X, at 196. Russell then called Higgins' bank, Friendly National, but the news there was less assuring. In Russell's first contact with the bank, Parrott told him that Higgins had only two accounts at the bank, one containing between $350 and $650, and the other containing between $1000 and $3000. Rus-

sell's response was, "You mean I'm talking sending a $100,000 to a man with two little bitty personal accounts?" *Id.* at 144.

Concerned because Higgins "had no money in his account to speak of," *id.* at 186, Russell took steps to ensure that Higgins actually had a contract for the diesel fuel. Russell never asked to see the contract himself, nor did he arrange for an attorney or anyone else to review its authenticity for him. Instead, Russell decided to verify the contract's existence by having Higgins take it to Friendly National, and having someone there describe it to Russell over the phone. Accordingly, on November 5, 1979, Higgins took the contract to Nona Parrott and asked her to take a telephone call from Russell. According to Parrott, she read the contract to Russell at his request, skipping parts of it whenever told to by Russell, and informing him whenever a word or phrase was blacked out or illegible. She testified that after reading the contract in this fashion for a short time, Russell interrupted her and stated "Never mind [reading the contract], just tell me the name of the company." Rec., vol. X, at 136. According to her testimony, Parrott responded that she could not see the company name because Higgins had covered that part of the contract with a sheet of paper. In response to Russell's inquiry about the general nature of the document, Parrott told him that the document had numerous changes and places marked out, that the signature was covered by the sheet of paper, and that she was unable to see the whole document.

Russell's testimony concerning the telephone exchange differs somewhat from Parrott's version. Russell testified that Parrott did not read the contract to him, but rather was willing only to answer any specific questions that he might tender.[4] *Id.* at 173, 200. Russell further asserted that Parrott said the document was signed,

---

3. Russell testified that he relied "heavily" on this assurance by Sullivan. *See* rec., vol. X, at 196.

4. In his deposition before trial, however, Russell stated that Parrott had read him the contract

"verbatim." Rec., vol. X, at 201. When confronted at trial with this inconsistency, Russell asserted that he could not remember "specifically, what happened on that date." *Id.*

and he denied that Parrott told him about the numerous strike-outs on the paper. Finally, Russell claimed that Parrott told him the paper "looked like ... a contract document."[5] *Id.* at 174; *see also id.* at 173–74.

Conflicting testimony aside, certain key facts are undisputed. Parrott is a high school graduate who never attended college or business school or had any post-high school training other than two classes in English and banking principles given by the American Banking Institute. She has no legal training and no experience with oil and gas contracts. More importantly, Russell admitted during the trial that he did not assume that Parrott was a lawyer, that she had any legal training, or that she was familiar with the oil and gas industry in any way. As we have already noted, it was Russell's idea to have Higgins take the contract to someone at the bank so Russell could ask questions regarding it.

■ Given these facts, we agree that no basis existed for a fraud claim against the bank. As the trial judge put it when he directed a verdict in favor of the bank,

> "[F]or a businessman to ask questions of an unknown bank officer, in this case an assistant cashier with a high school education, who is certainly not charged with the responsibility, nor expected to make such judgments, by her own employer, much less some stranger calling on the telephone, is, to say the least, not prudent business practice, but more pertinent to our purposes, certainly not fraud on her part."

Rec., vol. X at 218.

Before affirming an award of attorneys fees under the bad faith exception to the American rule, however, this circuit requires more than merely a finding that a claim was frivolous when brought. As we have noted before, the bad faith exception is drawn very narrowly, and may be resorted to "only in exceptional cases and for dominating reasons of justice." 6 J. Moore, Federal Practice ¶ 54.77[2] pp.

1709–11 (2d ed. 1972). *See Cornwall,* 654 F.2d at 687. For this reason, we have insisted that a trial judge make a finding of bad intent or improper motive by the guilty party before awarding attorneys fees. *See id.* The trial judge in the present case used the words "bad faith" in his order, an element missing in the *Cornwall* case, but that alone does not resolve the issue. The judge failed to tell us upon what factual basis he arrived at the conclusion of bad faith, other than that "the facts known to plaintiff did not justify the allegations of fraud." Rec., vol. I, at 235.

We have recognized that " 'a case can be so frivolous as to reflect impermissible conduct,' " *Rutledge,* 671 F.2d at 382 (quoting *Americana Industries, Inc. v. Wometco de Puerto Rico, Inc.,* 556 F.2d 625, 628 (1st Cir.1977)). Such a finding is particularly appropriate when the plaintiff has alleged a claim that is patently frivolous and that, like fraud, is also opprobrious by nature and designed to cause embarrassment and humiliation. The serious nature of the frivolous allegations against a plaintiff, particularly where they have a criminal connotation, is clearly a factor to be considered in determining whether the allegations were made in bad faith.

Although this notion may underlie the trial judge's finding in this case, he did not so specify in his order. *See Cornwall,* 654 F.2d at 687. Because the judge failed to provide us with enough information in his order from which we can determine that he was making a finding of conscious wrongdoing by Sterling Energy in bringing or continuing the case against the bank, we are unable to affirm the award of attorneys fees.

Rather than simply reversing the award of attorneys fees, however, we are remanding for more specific findings on this issue because we believe the award may well be justified in this case. This circuit has recently expressed concern with the unneces-

---

**5.** Parrott denied ever telling Russell that the paper appeared to be a valid or legitimate document.

sary burdens on the courts and opposing parties resulting from congested dockets combined with dilatory or otherwise vexatious tactics on the part of attorneys or their clients. *See In re Sanction of Baker,* 744 F.2d 1438 (10th Cir.1984) (en banc); *D & H Marketers, Inc. v. Freedom Oil & Gas, Inc.,* 744 F.2d 1443 (10th Cir.1984) (en banc); *Hollis v. United States,* 744 F.2d 1430, 1433 (10th Cir.1984). With that concern in mind, we remand this case for further consideration in light of this opinion.

Reversed and remanded.