LUCERO, Circuit Judge,
concurring.
The MLA provides, plainly and unambiguously, that “[n]o action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter.” 30 U.S.C. § 226-2. This restriction constitutes a condition on the United States’ waiver of sovereign immunity and must be strictly construed. Although my colleagues are led by the Energy Companies to import principles of final agency action from the APA, I view the final agency action issue as a needless diversion leading my colleagues on a wild goose chase for ambiguity that does not exist in the phrase “final decision of the Secretary.” Id.
From a policy perspective, my colleagues make a sound point. The notion that a statute of limitations may start running before a cause of action accrues appears improper on its face. If writing on a blank slate, I may well have adopted the rule the Energy Companies’ implicitly propose. But the Supreme Court has closed *1249 that door. In Dodd v. United States, 545 U.S. 353, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005), the Court was confronted with a statute’s unambiguous pronouncement as to the beginning of a limitations period and held that the plain text must be honored even if it “would make it possible for the limitations period to expire before the cause of action accrues.” Id. at 360, 125 S.Ct. 2478. Although the Court acknowledged “the potential for harsh results in some cases,” it held that courts “are not free to rewrite the statute that Congress has enacted” when a statute “clearly specifies the date on which the limitation period begins to run.” Id. (quotation omitted).
Following that directive, I conclude that the “final decision of the Secretary” in this case occurred on February 6, 2009 — the date of the Secretary’s last involvement in this matter. Whether “final agency action” also occurred on that date is irrelevant.
I
As with any statute, the starting point of our sovereign immunity analysis “must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used.” FTC v. Kuykendall, 466 F.3d 1149, 1154 (10th Cir.2006) (quotation omitted). However, a waiver of sovereign immunity “must be unequivocally expressed in statutory text, and will not be implied. Moreover, a waiver of the [g]overnment’s sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign.” Iowa Tribe of Kan. & Neb. v. Salazar, 607 F.3d 1225, 1236 (10th Cir.2010).
The district court’s decision that the MLA bars all of the Energy Companies’ claims is well-founded on the statute’s plain text. Although the Energy Companies argue strenuously that the final decision of the agency did not occur until the February 12 letters were sent, the MLA speaks of the “final decision of the Secretary.” 30 U.S.C. § 226-2 (emphasis added). Whether the February 6 memo would qualify as final agency action is a difficult question. My colleagues expertly lay out the arguments on both sides of this issue. Despite the Energy Companies’ emphasis on the final agency action issue, however, I see no reason to decide whether the February 6 memo qualifies.
Implicit in appellants’ argument is the premise that the MLA’s statute of limitations could not begin to run until their cause of action under the APA accrued. But this is not necessarily so. It is true that a “limitations period ordinarily does not begin to run' until the plaintiff has a complete and present cause of action.” Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 195, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997) (quotation omitted). In accordance with this norm, many federal statutes explicitly run from the date a claim accrues. See, e.g., 26 U.S.C. § 7433(d)(3) (“[A]n action to enforce liability created under this section may be brought without regard to the amount in controversy and may be brought only within 2 years after the date the right of action accrues.”); 28 U.S.C. § 2401(b) (“A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues .... ”). And the Supreme Court has acknowledged the “default rule that Congress generally drafts statutes of limitations to begin when the cause of action accrues.” Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 418, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005); see also Reiter v. Cooper, 507 U.S. 258, 267, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993).
*1250 However, the link between an accrual date and the beginning of a limitations period is not absolute. In Graham County, the majority rejected the position that courts should construe statutes to align the accrual and limitations period dates “regardless of whether the text is ambiguous.” 545 U.S. at 419 n. 2, 125 S.Ct. 2444. Instead, the Court held that this interpretive rule should be applied “to resolve that ambiguity, not to create it in the first instance.” Id. Additional guidance on applying this principle was offered in Dodd v. United States, 545 U.S. 353, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005). There, the Court held that an unambiguous limitations period start date must be followed even if it was “possible for the limitations period to expire before the cause of action accrues.” Id. at 360, 125 S.Ct. 2478. The Court distinguished Graham County, noting the statute in that case was “ambiguous, justifying the Court’s partial reliance on the standard rule that the limitations period commences when the plaintiff has a complete and present cause of action.” Id. Despite “the potential for harsh results,” the Court held, a statute that “clearly specifies the date on which the limitation period begins to run” must be given controlling effect. Id. (quotation omitted); see also Cloer v. Sec’y of Health & Human Servs., 654 F.3d 1322, 1333 (Fed.Cir.2011) (“Congress is free to provide the ‘odd result’ of a cause of action that arises at a time different from the beginning of a statute of limitations.”) cert. denied, — U.S.-, 132 S.Ct. 1908, 182 L.Ed.2d 807 (2012).
This court has also held that a limitations period may begin to run before a plaintiff has a complete cause of action. In Salisbury v. Hartford Life & Accident Ins. Co., 583 F.3d 1245 (10th Cir.2009), we enforced a contractual ERISA limitations period that began running prior to exhaustion of administrative remedies. See id. at 1248-49. We recognized that “a benefits claimant must pursue the administrative process to its conclusion before filing an ERISA suit,” and thus a claimant could not prevail in a suit prior to exhaustion. Id. at 1249. But we rejected plaintiffs’ argument that such a limitations period is unenforceable merely because it “allowed the claimant’s cause of action to accrue before the end of the administrative process.” Id. Noting that equitable tolling and other “[ljess drastic remedies” could correct potential inequities caused by such a system, we joined the Seventh Circuit in ruling that such limitations period are permissible. Id. at 1248, 1249 (citing Abena v. Metro. Life Ins. Co., 544 F.3d 880, 884 (7th Cir.2008)).
In accord with Dodd, I would abide the rule that if “the statute’s language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.” 545 U.S. at 359, 125 S.Ct. 2478 (quotation omitted). The MLA unambiguously starts the limitations clock when the Secretary makes a final decision, not when the BLM engages in final agency action. “It is for Congress, not this [cjourt, to amend the statute if it believes that the interplay of [these two statutes] unduly restricts” litigants’ ability to obtain relief. Id. at 359-60, 125 S.Ct. 2478.
II
Looking to the specific actions of the Secretary in this matter, it is clear that his decision was final when he sent the February 6 memorandum. Following that memorandum, the Secretary was wholly uninvolved in this matter. One would be hard-pressed to interpret the phrase “final decision of the Secretary,” id., as referring to a subordinate’s transmittal of the Secretary’s directive. The dissent suggests this conclusion is not entirely clear. (Dissenting Op. 1262-63.) Respectfully, I disagree. We must employ the “ordinary, *1251 everyday meaning” of the MLA. See Jonson v. Comm’r, 353 F.3d 1181, 1184 (10th Cir.2003) (quotation omitted). In everyday usage, a decision’s finality does not depend on subsequent re-transmittal.
My colleagues take the position that the relevant passages of the MLA and APA must have the same meaning because both statutes require finality. (See Concurring Op. 1253-56; Dissenting Op. 1261-62.) Borrowing from the APA jurisprudence regarding finality, they suggest that the Secretary’s decision could not have been final unless he took some action that “mark[ed] the consummation of the agency’s decision[-]making process” and was “one by which rights or obligations have been determined, or from which legal consequences will flow.” Bennett v. Spear, 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quotations omitted).
Although I agree that the term “final” has the same meaning in both statutes — its plain and ordinary meaning — I do not agree that “agency action” and “decision of the Secretary” have identical import. The characteristics that render one event “final” are not generally applicable to all events. The school day is final, for example, when the closing bell rings. But the ringing of a bell does not signal the end of a race; races become final when the last runner crosses the finish line.
By the same token, there can be no doubt that agency action becomes final when an event marks the consummation of the agency’s decision-making process. See id. But the Secretary’s decision does not become final when the agency has finalized its process; the Secretary’s decision is final when the Secretary has completed his decision-making process. And the Secretary completed his deliberative process on February 6. He had literally no further involvement in this matter after that date.
Similarly, the requirement that final agency action “be one by which rights or obligations have been determined, or from which legal consequences will flow,” id. (quotations omitted), stems directly from the APA. That statute provides a right of action for individuals “suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action.” 5 U.S.C. § 702. Until legal consequences are fixed, agency action will not qualify as final. But it does not follow that every statute using the word “final” contemplates impact on the legal rights of a litigant. One can easily envision an agency process in which Secretarial approval precedes some formal, rights-fixing step, such as recording a deed. It may be that a trip to the recorder’s office is necessary before the agency action can be considered final. But the Secretary’s involvement ends before that formal step is taken, and thus his decision would be “final” under the common usage of that word.
Consistent with Dodd, I would apply the unambiguous meaning of the MLA and conclude that the final decision of the Secretary in this case occurred on February 6. His decision was final at that point regardless of any subsequent action by agency subordinates.
Ill
I must acknowledge that a plain-text construction of the MLA allows for severity in certain instances. But three factors mitigate the potential for unjust results. First, this case is complicated by the unusual procedural posture. In a typical case, a decision moves up the administrative chain of command; a BLM office or bureau renders a decision, and a party adversely affected by that decision may appeal to the IBLA. See 43 C.F.R. § 4.410. The IBLA’s decision usually ends the agency’s proceedings. See 43 C.F.R. § 4.403. In this case, however, the Secretary exercised his prerogative to step into an ongoing agency proceeding. See 43 *1252 C.F.R. § 4.5 (Secretary possesses the “authority to take jurisdiction at any stage of any case before any employee or employees of the Department” and the “authority to review any decision of any employee or employees of the Department”).[1] Although the relevant rules expressly allow for such a procedure, it is unusual for the Secretary to personally decide a leasing dispute. In the vast majority of cases, the date an MLA limitations period begins will also clearly be the date of final agency action.
Second, I note that the primary problem caused by starting a limitations period pri- or to a public decision is also present under the Energy Companies’ proffered interpretation. Divergent limitation and accrual dates necessarily result in the loss of some portion of a limitations period. That is, the lag between an event triggering a statute of limitations and accrual of a claim leaves a plaintiff with something less than the full limitations period to prepare her suit. In extreme cases, the limitations period could be consumed entirely before a cause of action accrues. See Dodd, 545 U.S. at 360, 125 S.Ct. 2478 (noting potential for “the limitations period to expire before the cause of action accrues”).
But this issue also exists if we accept the Energy Companies’ contention that the February 12 letters started the MLA clock. These letters were mailed on February 12, but were presumably not received until a few days later. Thus, under either party’s interpretation, the Energy Companies would not have had the full 90-day limitations period to prepare their claims. This is true of every statute of limitations other than those that begin with notice. Compare 42 U.S.C. § 1395oo(f) (limitation period begins with notice) with 28 U.S.C. § 2401(b) (tort claims against the United States must be brought within “six months after the date of mailing ... of notice of final denial of the claim by the agency”). Regardless of whether the limitations period began on February 6 or February 12, the Energy Companies logically could not have filed a claim until at least some portion of the limitations period had passed.
The dissent suggests that this analogy is inapt because mailing a letter to an affected party “serves the important goal of making statute-of-limitations disputes easy to resolve — a court need only look to a letter’s postmark or an email’s timestamp.” (Dissenting Op. 1268.) But the same is true of the Secretary’s February 6 memorandum. That transmittal similarly contains an easy-to-prove date that made “it simple for the recipient to calculate the amount of time he has to challenge the decision.” (Id.) I further note that the Energy Companies were made well aware of the importance of the February 6 date during agency proceedings, and had adequate opportunity to file a timely suit. *1253 The plain-text approach differs in degree from the Energy Companies’ proposal, but not in kind.
Third, the parade of horribles regarding secret agency decision-making is largely mitigated by the availability of equitable tolling. As the Supreme Court explained in Irwin, we employ a “rebuttable presumption” that equitable tolling is available even when a statute of limitations is a condition on the waiver of sovereign immunity. 498 U.S. at 95-96, 111 S.Ct. 453. Courts are thus empowered to avoid truly inequitable outcomes through tolling — a distinct issue from the proper interpretation of a statute of limitations. I am fully confident that courts will utilize this doctrine in appropriate cases to preclude agencies from playing fast and loose with limitations periods.
Although these factors help to alleviate the potential for unjust results, my views on this case rest ultimately on the clear language of the MLA. The Supreme Court has emphasized that we may not disregard the plain text of a statute that “clearly specifies the date on which the limitation period begins to run.” Dodd, 545 U.S. at 360, 125 S.Ct. 2478. That admonition is especially appropriate in this case because the MLA’s limitation period constitutes a condition on the United States’ waiver of sovereign immunity, and thus must “be strictly construed, in terms of its scope, in favor of the sovereign.” Iowa Tribe of Kan. & Neb., 607 F.3d at 1236. Regardless of the various APA provisions upon which the Energy Companies rest their case, we must apply the MLA as written. Accordingly, I conclude that the limitations period began to run on February 6, when the Secretary made his final decision.

. The Energy Companies argue that the Secretary has delegated the authority to manage oil and gas lease to the BLM and thus cannot issue a final decision on such matters. See Onshore Oil and Gas, General, 48 Fed.Reg. 36,582 (Aug. 23, 1983) ("All of the Department of the Interior’s non-royalty responsibilities related to the approval and supervision of operations on onshore Federal and Indian (except Osage) and oil and gas leases have been consolidated within the Bureau of Land Management.”). But this argument misunderstands agency delegation. The Secretary’s decision to empower the BLM merely allows the agency to act in the Secretary’s stead; it does not render the servant the master. See Schraier v. Hickel, 419 F.2d 663, 667 (D.C.Cir. 1969) ("[T]he Secretary does not lose his ultimate [MLA] authority because the Department officials assumed that appellant would be awarded a lease if he were found to qualify in all respects under pending regulation.”). As 43 C.F.R. § 4.5 makes clear, the Secretary has independent authority to overrule subordinate officials, and actions ordered by the Secretary himself are not administratively appealable. See 43 C.F.R. 4.410(a).